# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBIN LYNN ROOT,

Defendant-Appellant.

UNPUBLISHED
August 31, 2017

No. 331123
Kent Circuit Court
LC No. 15-004835-FC

Before: SAWYER, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

Defendant, Robin Lynn Root, appeals by right her conviction following a jury trial of first-degree premeditated murder, MCL 750.316(1)(a), arising from the death of Janna Kelly in December 2007. The trial court sentenced Root to serve life in prison without the possibility of parole. Among other claims of error on appeal, Root contends that her conviction should be reversed because the trial court erroneously denied her motion to suppress portions of her April 27, 2015 videotaped statement to the police that were obtained in violation of her constitutional rights. Namely, she contends that police procured her statements through what turned into a custodial interrogation without informing her of her *Miranda*[1] rights, thus depriving her of her Fifth Amendment privilege against self-incrimination. Because we agree with Root that the trial court should have suppressed portions of her videotaped statement and that the error was not harmless, we must vacate her conviction and remand for a new trial. As she will be facing a new trial, we will also briefly address her other issues on appeal.

## I. BASIC FACTS

On the evening of December 4, 2007, Janna Kelly went missing from her Grand Rapids, Michigan, home. Her daughter and boss became concerned, and a police investigation ensued after Kelly's purse, wallet, and a fleece jacket were discovered abandoned at a local car wash the next day. Police also discovered Kelly's car parked in a neighborhood within walking distance of Kelly's home. Officers found blood on the car and on the jacket; test results showed that it belonged to an unidentified female donor. Officers also obtained Kelly's phone records and

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

found that her phone had traveled from Grand Rapids to a location in Ottawa County on December 5, 2007.

In the course of looking for her mother, Kelly's daughter searched her mother's house and discovered that Root had called Kelly's home phone on the night of her disappearance. The daughter also discovered a note Kelly had written indicating that she was arranging to have Root pay a judgment that Kelly obtained against Root after she evicted Root from the duplex that she owned. The duplex was located behind Kelly's home.

Detective Tim DeVries with the Grand Rapids Police Department interviewed Root on Thursday, December 6, 2007. At the request of police, Root and her live-in male companion drove to the police station to be interviewed. Root's interview was recorded. At the time of the interview, Root was living in a different rental home located behind Kelly's house. Root acknowledged that when the police first approached her house that day, she told them they were probably there to talk with her about her ex-landlord. She explained that she saw the news story on television that evening and recognized Kelly immediately. Root stated that she had last seen Kelly the Saturday before and acknowledged that it was in regard to money she owed Kelly for unpaid rent, for which Kelly had obtained a judgment. Root described her personal encounters with Kelly on Wednesday, November 28 and Saturday, December 1, 2007, both occurring at Kelly's house. She was very detailed in answering questions concerning her whereabouts in the days leading up to Kelly's disappearance, including where she was when making two telephone calls to Kelly—at 5:02 p.m. and at 6:15 p.m.[2]—on Tuesday, December 4, 2007, the evening Kelly disappeared. However, when asked about her activities on Wednesday, December 5, 2007, which was the day after Kelly's disappearance and only one day prior to the police interview, she took a long time to answer and became extremely vague. She stated that she was home for the most part, but that she was also over at her daughter's house and ran some errands. When asked about what errands she ran, she stated that one of them included getting gas. When asked what gas station she went to, Root said she could not recall, but that it was probably one of two that she typically uses. She stated that the farthest she drove that day was to pick up her son at his school, Forest Hills Central, which is located in Cascade, Michigan. When asked if she ever gets up to Grand Haven, Hudsonville, Jenison, or Zeeland, she said no, "I don't try and go that far" and that there was no reason for either her or her male companion to be out that way. Root voluntarily provided a DNA sample; it was not immediately sent to the lab for testing.

In March 2008, a surveyor discovered Kelly's remains while surveying a property in Grand Haven Township. Testimony and evidence established that someone had stripped Kelly of her clothing, dumped her in a secluded area, and set her on fire using gasoline, with charring most prominent around her face and upper body. There was also evidence that her mouth and limbs had been duct taped. Due to the partial burning, exposure to the environment, and animal activity, the medical examiner could not determine whether the perpetrator had asphyxiated Kelly. The medical examiner determined that Kelly died from homicide by unspecified means.

---

[2] Root stated that she made the second call from her car after she left her daughter's house and was driving to her own home; she volunteered that she had stopped for gas on her way home.

More than six years passed without discovering who killed Kelly. In 2014, cold case detectives Venus Repper and Kreg Brace with the Ottawa County Sheriff's Office reviewed Kelly's case. Repper noticed that some DNA profiles had not been sent to the laboratory that tested the blood from Kelly's car and the jacket found at the carwash. She contacted DeVries about her discovery and the additional samples were sent to the lab. The results of the testing showed that the blood matched Root's DNA profile. DeVries also analyzed cell phone data and learned that Root's cell phone had moved along the same path at the same time that Kelly's cell phone had traveled west from Grand Rapids to Grand Haven on Wednesday, December 5, 2007. Root's cell phone stopped for a period of time in the same area where Kelly's remains were later found.

Repper and Brace contacted Root and visited her home on April 21, 2015, conducting a short, audiotaped interview, and arranging for her to visit the Ottawa County Sheriff's Office in West Olive the next day for a formal interview. The detectives did not inform Root about the DNA and cell phone evidence they had obtained. The following day, Root drove herself to the Sheriff's Office, where, in another audiotaped interview, she answered casual questions for 90 minutes before cutting the interview short in order to pick up her granddaughters from school. The interview ended before any detailed discussion of Root's whereabouts and activities at the time of Kelly's disappearance. Root arranged with detectives to complete the interview on another day. On April 27, 2015, Root again drove herself to the Sherriff's Office, where her interview with detectives began at 11:44 a.m. and lasted for approximately six hours. The interview was videotaped.[3] After several hours of questioning, the detectives extracted from Root a confession. Root unsuccessfully sought to suppress the confession from being admitted as evidence at trial.

At her trial, Root conceded that she killed Kelly and dumped her remains in Ottawa County, but she argued that Kelly's death was an accident and that she covered up the crime out of panic. As already noted, the jury rejected Root's defense and found her guilty.

Root now appeals in this Court.

## II. MOTION TO SUPPRESS CONFESSION

Root first argues that the trial court erred when it denied her motion to suppress portions of her April 27, 2015 interview with detectives. She maintains that her inculpatory statements were inadmissible at trial because the detectives failed to advise her of her constitutional right against self-incrimination as required by the *Miranda* decision before subjecting her to a custodial interrogation. Based on a careful review of the record, we conclude that by the time detectives were able to procure a confession from Root, the interrogation had turned custodial.

---

[3] Notably, a DVD of the videotaped interview constitutes the evidentiary record. Although there is a typewritten transcript of the interview, it is not entirely accurate, it fails to transcribe significant portions at the end of Root's interview, and the trial court did not admit it as evidence. Moreover, it does not describe the interrogation room or the position of the parties in the room and their body posture, tone, and other relevant considerations.

## A. STANDARDS OF REVIEW

This Court reviews the trial court's factual findings underlying its decision on a motion to suppress for clear error. *People v Vaughn*, 291 Mich App 183, 188; 804 NW2d 764 (2010), vacated not in relevant part, 491 Mich 642 (2012). "However, this Court reviews de novo, as a question of law, whether the facts show that defendant was in custody and entitled to Miranda warnings." *Id.*

## B. CUSTODIAL INTERROGATION

In *Miranda*, the Supreme Court of the United States recognized that that there was a heightened risk of improper coercion when a suspect is subjected to a custodial interrogation. *Miranda*, 384 US at 455-456 (noting that the "very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals," and opining that many persons who might have asserted their rights will not do so when submitted to an "incommunicado police-dominated atmosphere"). The Court determined that the potential for improper coercion implicated the "Fifth Amendment right to be free from compelled self-incrimination." *Vaughn*, 291 Mich App at 188, citing *Miranda*, 384 US at 458. To protect against coercion of this nature, the Court in *Miranda* required the interrogating officer to advise the suspect of his or her fundamental rights before conducting a custodial interrogation. *Id.* at 188-189. " '[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against' " the person interrogated. *Id.* at 189, quoting *Miranda*, 384 US at 479.[4]

In this case, there is no dispute that the detectives interrogated Root when they questioned her on April 27, 2015, at the Ottawa County Sheriff's Office. See *People v White*, 493 Mich 187, 195; 828 NW2d 329 (2013) (stating that an officer interrogates a person when the officer asks an express question or makes a statement or takes an action that the officer should know is reasonably likely to elicit an incriminating response), citing *Rhode Island v Innis*, 446 US 291, 300-302; 100 S Ct 1682; 64 L Ed 2d 297 (1980). There is also no dispute that the detectives did not formally place her under arrest or advise Root of her rights until DeVries told Root that she was "obviously" under arrest and advised her of her rights at about 4:35 p.m., which was about five hours after the interrogation began and one and a half hours after Root began her confession. The question on appeal is whether Root was in custody for purposes of the rule stated in *Miranda* at some point before DeVries formally notified her that she was under arrest.

An interrogating officer has no obligation to administer the warnings required under *Miranda* until "there has been such a restriction on a person's freedom as to render him in custody." *Stansbury v California*, 511 US 318, 322; 114 S Ct 1526; 128 L Ed 2d 293 (1994) (quotation marks and citations omitted). "[C]ustody is a term of art that specifies circumstances

---

[4] As noted in *Miranda*, "It is not admissible to do a great right by doing a little wrong. It is not sufficient to do justice by obtaining a proper result by irregular or improper means." *Miranda*, 384 US at 447 (quotation marks and citations omitted).

that are thought generally to present a serious danger of coercion." *Howes v Fields*, 565 US 499, 508-509; 132 S Ct 1181; 182 L Ed 2d 17 (2012). Courts determine whether a person was in custody at the time of his or her interrogation by examining all the circumstances surrounding the interrogation to determine how a reasonable person would gauge the breadth of his or her freedom of action under the same circumstances. *Yarborough v Alvarado*, 541 US 652, 662-663; 124 S Ct 2140; 158 L Ed 2d 938 (2004). The key inquiry is whether under the totality of the circumstances a reasonable person would have felt at liberty to terminate the interrogation and leave.[5] *Vaughn*, 291 Mich App at 189; see also *Berkemer v McCarty*, 468 US 420, 442; 104 S Ct 3138; 82 L Ed 2d 317 (1984) (stating that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 US at 509 (citations omitted).

Root's April 27, 2015 interrogation took place at the Ottawa County Sheriff's Office. As previously indicated, it was not her first police interview regarding Kelly's disappearance. DeVries had interviewed Root on December 6, 2007, just two days after Kelly's disappearance. Root agreed to speak with detectives at the Grand Rapids Police Department and appeared there voluntarily. She was calm and collected, and carefully answered the questions posed. Detectives did not arrest her after the interview; indeed, she had no further contact police concerning Kelly's disappearance until the cordial interview with Repper and Brace at her home on April 21, 2015. Root subsequently drove herself from Grand Rapids to the Ottawa County Sheriff's Office the next day, as arranged, and submitted to additional questioning by Repper and Brace. The questions were not confrontational or adversarial and largely involved Root's background and personal history leading up to the time at issue. Root terminated the interview early in order to pick up her grandchildren from school and, although the detectives urged her to stay, they did not prevent her from leaving. She then arranged to complete the interview on a different day and ultimately rescheduled the interview for April 27, 2015.

During the early stages of the April 27, 2015 interview, a reasonable person with Root's experiences of prior interviews would have felt free to terminate the interrogation and leave the Sheriff's Office. Root agreed to appear at the Sheriff's Office, as she had on previous occasions,

---

[5] In *People v Hill*, 429 Mich 382, 391; 415 NW2d 193 (1987) our Supreme Court made clear that "*Miranda* warnings need only be given where there is 'custody' and that, absent custody, the fact that an individual has become the 'focus' of the investigation does not trigger the *Miranda* requirement." It was " 'the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the [United States Supreme Court] to impose *Miranda* requirements with regard to custodial questioning.' " *Hill*, 429 Mich at 390, quoting *United States v Caiello*, 420 F2d 471, 473 (CA 2, 1969). In other words, just because Root became a prime suspect did not entitle her to *Miranda* warnings. Rather, we must decide, de novo, whether at some point in the interrogation, a reasonable person in Root's position would not have felt at liberty to terminate the interrogation and leave.

drove herself to the office, and chose to answer the questions detectives put to her. The detectives did not formally arrest her or tell her she could not leave. Although they never told her she was free to leave at any time, she had left of her own accord after all prior encounters. The fact that she was interrogated in a police station did not by itself render her in custody for purposes of *Miranda*. See *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977). Review of the videotaped interrogation shows that, although the first three hours of the interrogation grew progressively more uncomfortable for Root, the interrogation was not custodial. Root was seated at a conference table in a windowless room with the door closed. Most of the time, she was flanked by two armed, plainclothes detectives asking her questions, but the detectives did not brandish their weapons or restrain her. See *United States v Patterson*, 826 F3d 450, 455 (CA 7, 2016) (noting that whether the officers displayed their weapons or engaged in physically threatening behavior is a factor to consider). Moreover, the detectives offered her beverages[6] and informed her that if she needed a break, she should just ask. The officers did not search Root or restrict her access to her purse or phone. See *United States v LeBrun*, 363 F3d 715, 722 (CA 8, 2004) (en banc) (stating that the mere presence of a cell phone will not transform a custodial interrogation into a noncustodial interrogation, but recognizing that it is a factor to consider).

The interview began in the same friendly manner as her prior interviews. Root continued to describe her activities around the time of Kelly's disappearance in much the same way as she had previously described them. She recounted events in ways that provided innocent explanations for incriminating evidence the officers might have had and she subtly implicated others in Kelly's disappearance.[7] When questioned about her previous claim that she had not been to the Grand Haven area the day after Kelly disappeared, Root repeatedly dodged the question and suggested that her earlier statement was mistaken.

Although the detectives' statements and tone revealed their increasing doubt over Root's responses and their questions grew progressively more confrontational during the first three hours of the interview, a reasonable person in Root's position would have felt at liberty to end the interrogation by the two sheriff's detectives and leave. *Vaughn*, 291 Mich App at 189. And while the detectives made expressly clear two and a half hours into the interrogation that they

---

[6] As this Court recently opined, however, "[p]rovision of a beverage does not vitiate custodial pressures, nor does it replace the *Miranda* warning as a constitutional guarantee." *People v Barritt*, ___ Mich App ___, ___; ___ NW2d ___ (2017), slip op at 8 n 14.

[7] For example, although the detectives had not yet discussed any evidence surrounding the crime, such as the blood on Kelly's car and the fleece jacket, Root volunteered that she had helped Kelly carry groceries from her car to the kitchen on Wednesday, November 28, 2007, and had dry, cracked hands on that day and needed a Band-Aid. With regard to the fleece jacket, which was found at the car wash where Kelly's personal items were abandoned, Root volunteered that she wore her boyfriend's fleece coat to Kelly's home that evening, left it there, and never recovered it. Root also stated that when she visited Kelly's house on Saturday, December 1, 2007, sitting at Kelly's kitchen table was a male neighbor, who, Root surmised, might have had a dispute with Kelly around that time.

believed Root was involved in Kelly's murder, Root's becoming the focus of the investigation is not a triggering event for *Miranda* purposes. *People v Hill*, 429 Mich 382, 391; 415 NW2d 193 (1987).

Even though Root was not in custody when the interrogation began, statements by the officers could transform the noncustodial interrogation into a custodial interrogation. See *Tankleff v Senkowski*, 135 F3d 235, 244 (CA 2, 1998) (holding that the officers' increasingly hostile questioning over the course of the more than five hours of interrogation transformed the character of the interrogation into a custodial interrogation at a point before the defendant was advised of his rights consistent with *Miranda*).[8] In the instant case, nearly three hours into the interrogation, at approximately 2:25 p.m., the nature of the interrogation changed in a way that affected whether a reasonable person would have continued to feel at liberty to terminate the interview and leave the Sheriff's Office. See *Tankleff*, 135 F3d at 244. As an apparent interrogation technique, Repper walked out of the room, visibly frustrated, and DeVries entered the room, taking Repper's seat. DeVries was also in plain clothing, but the gun on his belt was clearly visible. DeVries reminded Root that he had interviewed her in 2007. His tone was accusatory and intense. He stated almost immediately that he had been watching the entire interview, knew that Root was "clearly lying to us" and told Root she was "probably pretty scared right now, as you should be." He proceeded to share with her all of the "extremely compelling" and "irrefutable" evidence implicating her in having committed first-degree pre-meditated murder, including cellular telephone records and DNA evidence. While sharing inculpatory evidence with a suspect and intentionally making them uncomfortable does not trigger the need to give the *Miranda* warnings, over the next half hour, DeVries and Brace repeatedly made remarks that increasingly implied that prosecutors were immediately going to bring criminal charges against Root.

The detectives represented that whether prosecutors were going to charge her based on the evidence at hand was already decided, the only question was the seriousness of the offense with which she would be charged. They told her that unless she talked and told them honestly what happened, they had more than enough evidence to charge her, and that prosecutors would charge her with first-degree, premeditated murder. By repeatedly stating that prosecutors were standing by in the next room, watching her and waiting, assessing her interview to determine

---

[8] *Tankleff* also identified various factors courts have looked at in determining whether a reasonable man or woman in the suspect's position would have felt at liberty to terminate the interrogation and leave, including:

> "whether a suspect is or is not told that she is free to leave, *see Campaneria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989); the location and atmosphere of the interrogation, *see Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977); the language and tone used by the police, *see United States v. Guarno*, 819 F.2d 28, 31–32 (2d Cir.1987); whether the suspect is searched, frisked, or patted down, *see United States v. Wilson*, 901 F.Supp. 172, 175 (S.D.N.Y.1995); and the length of the interrogation, *see Berkemer*, 468 U.S. at 437–38, 104 S.Ct. at 3148–49." [*Tankleff*, 135 F3d at 244.]

which criminal charges to bring, detectives forcefully implied that Root was going to be criminally charged right then, and thus was not free to leave. They indicated that a reduction of the inevitable charge to something less than first-degree murder depended on her confessing to whatever happened; if she said nothing, they would assume the worst and she would be facing charges of first-degree murder.

Characteristic of this portion of the videotaped interview is a sense of inevitability and immediacy of the charges against Root, and the urgency with which she needed to respond immediately if she were to have any chance of mitigating a certain charge of first-degree murder. For example, as he began to reveal all of the inculpatory evidence against Root, DeVries told her, "we're gonna be explaining all of this to a jury. And you can say . . . 'No, no, no' to them. But they're gonna hear it. And there are experts gonna testify to this. . . . But it gets worse for you." He told her, "[w]e're just getting started." Brace unveiled more evidence and DeVries stated:

> Robin, here's the thing. We're just getting started here. We've been investigating this for way longer than you, I mean, we're just getting started here right now. Uh, *the jury is gonna hear all this information. It's extremely compelling. We got the prosecutor's office watching right now, okay? There is gonna come a time when number one, you're gonna be – we're just gonna have to assume the worst of a cold-blooded, first-degree murder.* We don't know the true story. . . . But *we're gonna have to assume that if you don't want to tell us the truth about what happened, that it was first-degree, cold blooded murder . . . .* But if you don't wanna tell us, *we've got enough right here to go ahead and charge with first degree murder. We're gonna have to assume the worst* (emphasis added).

DeVries later stated "You're just gonna have to make the decision. You wanna tell us what really happened? Or do you wanna go down for first degree murder, premeditated?" He reiterated evidence showing "it's clearly you" and continued, "at this point, this investigation has been so long and I got so much evidence, I'm perfectly willing just to go ahead and, uh, premeditated murder." Brace advised Root that as for which charge she would face, "[w]e . . . have a team of prosecutors and a few judges that are—that are looking into that aspect, depending on how honest or not you are." DeVries interjected that the timing was immediate: "That's what this interva-was-is about right now. . . . This is your opportunity to tell us before this all blows up all over the place." Brace informed Root that she needed to gauge what the jury was going to hear, and indicated that he had revealed some but not all of the evidence against her. He indicated that the judge and jury "will hear" the evidence. DeVries told Root, "Quite frankly, this is your opportunity. I've been investigating this . . . a very long time now. And *now is your time* to tell us what happened, what went down at the house because we have the evidence we need *now*. And it only gets worse from here (emphasis added)." He proceeded to shut down an explanation Root gave about why her blood might be on the car with more evidence.

DeVries repeatedly made remarks that would lead a reasonable person to believe he or she would immediately be charged with murder: "Do you wanna tell us . . . what happened to her or do you not? That's the decision you're gonna have to make *right now* because *we got prosecutors standing by*. And they wanna hear too (emphasis added)." Brace shared another

piece of evidence implicating Root and told her, "Now . . .there's enough evidence against you for us to try that charge and charge you with first degree murder with intent. And you –you saw some of that evidence." Root asked why, if they had all this evidence against her, they waited so long to come forward with it. DeVries responded, "Because we're—we're coming forward to you *right now. If we would have done it next week, you would have said, 'Why didn't you do it earlier?' We're doing it *right now* (emphasis added)." Brace and DeVries explained that a lot of the evidence they had against her they had collected fairly recently, and DeVries stated, "the before is *right now*. I mean, we're coming to you *right now*. You have to make a decision. *Prosecutor has to make a decision based upon what you say here and now* and your truthfulness about what happened of how things are gonna proceed going forward (emphasis added)." DeVries repeated, "We're . . . bringing the . . . evidence to you *right now*. . . This is when we're doing it (emphasis added)." DeVries later stated that Root should do herself a favor and just tell them what happened, that if this was anything other than first-degree murder "you had better get out in front of it right now before this hits the news, hits everything." He snapped his fingers, waved his hands, and said, "It's gonna be everywhere."

At 2:52 p.m., after DeVries' comment implying that her criminal prosecution for first-degree murder was going to hit the news and be everywhere, Root asked, in what sounded more like a defeated conclusion than a question, "So I'm being arrested?" Neither detective said no. Instead, DeVries evasively responded,

> I tell you what. *We got two prosecutors in the next room.* You could probably say hi to them *right now*. And everything you say *right now* they're taking into consideration. If you don't wanna tell us your story, you know, *we'll take a break*.[9] We'll talk to them. "She doesn't wanna tell us what happened." If you wanna tell us the story, they're gonna take all that into consideration. [Emphasis added.]

Brace added, "We have to give you the—the opportunity to be truthful." DeVries agreed, "We have to and we want to. Not only do we have to, we want to 'cause it's only fair. . . ." He later added:

> A lot of what's going to happen going forward *right now* is dependent upon what you do with, uh, and I've already explained the evidence we have. I've already explained the direction this is going to go. It's either gonna go this way [gesturing and implying the route of first-degree murder charges], or we're gonna listen to your version of the story. . . . how you proceed at this point is gonna determine . . . what goes on from here. [Emphasis Added.]

---

[9] Notably, DeVries did not deny that Root was being arrested, nor did he state that she was free to leave or that a decision by the prosecutors would be made at a later time. Rather, he indicated that if she did not want to tell them what happened, they would "take a break." DeVries' deliberate evasion of Root's question arguably was more likely to have confirmed a reasonable person's impression that he or she was not free to leave.

Devries cautioned Brace not to reveal any more of their incriminating evidence, and told Root, "we've done our job. And now I wanna give you the opportunity . . . . unless, again, you did it in cold-blooded, first-degree murder." DeVries told Root, "And it's . . . this is not gonna be like back in 2007. This is not something you can put a Band-Aid and walk away from. This is your decision. . . . *Prosecutors are waiting. They're watching you right now* (emphasis added)."

Then the detectives stopped talking, stared at Root, and waited for her decision. At 2:56 p.m., Root stated, "I don't know how to tell you," and she proceeded to confess. At one point early in her confession, Root hedged, and DeVries pointed over to the imaginary prosecutors standing by and stated, "[t]hey wanna know what happened" with regard to night of December 4, 2007, which led to Kelly's death.

The repeated references to prosecutors standing by outside the interrogation room and watching, purportedly deciding which offense to charge Root with for Kelly's death—not whether to charge—would strongly suggest to a reasonable person that he or she was no longer at liberty to terminate the interview and leave. See, e.g., *Tankleff*, 135 F3d at 244 (observing that by the time police falsely asserted that the defendant's father had awakened from his coma and accused defendant of trying to murder him, a reasonable person in the defendant's position would not have felt free to leave). A reasonable person would draw the same conclusion from the detectives' repeated references to the evidence the prosecutors "will" present at trial, the forensic experts who "are gonna" testify, the jury that "will hear" all of the evidence, and the anticipated explosive news story that's "gonna be everywhere." Such statements, along with the hostile, accusatory tone employed when DeVries entered the interrogation room and engaged in an unveiling of all the incriminating evidence, would indicate to a reasonable person that the detectives were not contemplating whether to arrest Root—that decision had already been made—but were simply giving her a chance to explain herself and potentially reduce the imminent and inevitable charges to something less than premeditated murder.

Considering the totality of the circumstances, we conclude that by the time Root asked whether—or came to the conclusion that—she was "being arrested," a reasonable person in Root's position would believe, as she did, that she was no longer at liberty to end the interrogation and leave. A reasonable person would believe that if she did not immediately confess or tell her version of the story, she would be arrested on the charge of first-degree murder and obviously not be free to leave. For this reason, the detectives had an obligation at least by that point to advise Root of her rights in accordance with *Miranda*. Because they did not do so, the statements she made after that point could not be used against her. *Vaughn*, 291 Mich App at 189, citing *Miranda*, 384 US at 479.

## C. STATEMENTS AFTER *MIRANDA* WARNINGS

The fact that an officer improperly questioned a suspect in violation of the requirements of *Miranda* does not necessarily taint any subsequent confession:

> Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into "custody" or his freedom has otherwise been significantly restrained. Unfortunately, the task of defining "custody" is a slippery one, and "policemen

investigating serious crimes [cannot realistically be expected to] make no errors whatsoever." If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. [*Oregon v Elstad*, 470 US 298, 309; 105 S Ct 1285; 84 L Ed 2d 222 (1985) (citations omitted).]

The Supreme Court in *Elstad* rejected the contention that a police officer's failure to properly advise a suspect necessarily tainted any subsequent confession, even if the suspect made the statement after being properly advised under *Miranda*, because the failure "to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Id.* at 310. As such, a "careful and thorough" subsequent administration of the warnings could "cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310-311. The Court reached that result even though it recognized that a defendant might already have "let the cat out of the bag" and, on that basis, was no longer free of the psychological and practical disadvantages of having confessed. *Id.* at 311. The Court explained that suppressing a confession subsequently made on that basis alone would come at too high a cost:

> This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver. The Oregon court, by adopting this expansive view of Fifth Amendment compulsion, effectively immunizes a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent. This immunity comes at a high cost to legitimate law enforcement activity, while adding little desirable protection to the individual's interest in not being *compelled* to testify against himself. When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder. [*Id.* at 312-313 (citations omitted).]

Although the admissibility of a statement made after being advised consistent with *Miranda* will ordinarily turn on whether it was knowingly and voluntarily made, *id.*, there are circumstances where a "question-first" policy may taint a subsequent statement even though the statement was made after the suspect was properly advised of his or her rights. See *Missouri v Seibert*, 542 US 600, 611; 124 S Ct 2601; 159 L Ed 2d 643 (2004) (opinion by SOUTER, J.).

In *Seibert*, a plurality of the United States Supreme Court addressed how *Miranda* applied in situations where police officers deliberately use a two-stage interrogation technique—one stage without providing the warnings required by *Miranda* followed by a second stage eliciting the same confession after giving the warnings required by *Miranda*—in order to evade the requirements of *Miranda*. *Id.* at 610-611. The plurality determined that the proper inquiry under such circumstances was to determine whether the officer's advice of rights served the prophylactic purposes behind the *Miranda* requirement: "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611-612. That is, could the advice of rights at that point reasonably convey that the suspect could choose to stop talking even if he or she had earlier talked? *Id.* at 612.

The plurality determined that the insertion of *Miranda* warnings as part of a "coordinated and continuing interrogation" were more likely to mislead the suspect about his or her rights and the consequences of abandoning them; they explained that "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id.* at 613-614. Because the technique used by the officers in that case was "dedicated to draining the substance out of *Miranda*," the advice of the rights under those circumstances did not serve their intended purposes. *Id.* at 617. Accordingly, the plurality held that the defendant's entire confession in that case—both before and after *Miranda* warnings—was inadmissible. *Id.* at 616-617.

In reaching that conclusion, the plurality distinguished the facts of its case from those in *Elstad*. *Id.* at 615. The Court explained that the officer's failure to provide warnings in *Elstad* appeared to have been inadvertent and posed no threat to the warn-first practice encouraged by the decision in *Miranda*. It thus framed the decision in *Elstad* as an exception for an officer's good-faith mistake about the need to provide the warnings required under *Miranda*. *Id.* at 615-616.

In this case, the evidence does not suggest that the detectives engaged in a deliberate two-stage interrogation technique designed to evade the requirements of *Miranda*. At the hearing on the motion to suppress, DeVries conceded that he joined Root's interrogation on April 27, 2015, to confront her with the evidence that they had. He testified that he believed Root had knowledge about Kelly's death, but he did not know what she might say. He stated that they did not decide to arrest her until around 5 p.m. Until that moment, Root was free to end the interview and leave, just as she had before. After he arrested her, he read Root her rights, and she agreed to waive her right to remain silent.

The detectives continued to question Root after advising her of her rights, but they inquired about details not addressed in their earlier questions. That is, the questions did not appear to involve an attempt to obtain the same incriminating statements post-*Miranda* that they had obtained pre-*Miranda*. Moreover, although the detectives took a more aggressive tone and confronted Root with evidence after about 2:20 p.m., they in good faith could have believed that a reasonable person in Root's position would still feel at liberty to end the interrogation and leave. This is especially true given that the detectives knew that Root had already asserted her right to end a previous interview and knew that Root had used the current interview to provide

potentially exculpatory explanations for otherwise incriminating evidence. Because the detectives' failure to warn Root consistent with *Miranda* was more akin to the inadvertent mistake in *Elstad*, and was not part of an interrogation technique designed to evade the requirements of *Miranda* as found in *Seibert*, whether Root's later statements were inadmissible depends on whether she made the statements voluntarily. *Elstad*, 470 US at 318.

## D. VOLUNTARY STATEMENT

Root has not challenged whether she knowingly and voluntarily waived her rights after officers advised her of them. However, she does argue that the trial court should have also suppressed the statements she made after 2:39 p.m. on April 27, 2015, because she did not voluntarily make them. More specifically, she argues that her will was overborne by "confrontational persistent police influence." As our Supreme Court has stated, whether a defendant made a voluntary statement depends on whether the confession was the "product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (quotation marks and citations omitted).

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.* at 334.]

No single factor is conclusive. *Id.*

In this case, the detectives did not physically abuse Root or threaten her with abuse. There was also no evidence that she was injured, in ill health, or otherwise under the influence of any substance. Moreover, Root herself set the time and date of her interview and drove herself to the Sheriff's Office. She had also previously participated in several interrogations and actually exercised her right to end a previous interrogation. She stated that she had some post-high school education, and her demeanor and statements during the various interviews demonstrated that she was reasonably intelligent, understood the import of the detectives' questions, and gave them carefully considered answers. Indeed, Root took the opportunity during this time to make statements that provided an exculpatory explanation for potential evidence against her. Further, although the interrogation lasted more than six hours in total, the detectives also asked Root if she needed anything or wanted to take a break, and she responded each time that she did not want anything and did not need a break. These factors all suggest that Root's decision to speak with the detectives was voluntary. *Id.*

Notwithstanding the evidence that Root voluntarily chose to speak with the detectives, Root argues that the detectives overcame her will at a later point in the interrogation (after 2:39 p.m.) by confronting her with the evidence, accusing her of first-degree murder, and threatening to involve her daughters as accomplices. In order to be voluntary, a statement must be the product of a free and deliberate choice—it must not be induced by intimidation, coercion, or deception. See *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000). Threats against a third party may render a confession involuntary. See *People v Givans*, 227 Mich App 113, 123; 575 NW2d 84 (1997).

The detectives in this case did not threaten to arrest Root's daughters for Kelly's murder. They stated their belief that Root could not have moved Kelly's body without help and suggested that her daughters might have helped. DeVries also, at one point, indicated that officers were questioning Root's daughters. Nevertheless, Root initially stated that she had no fear of the detective's claim because she did not do this and her children did not do this. And, before Root gave any incriminating statements, the detective clarified that it was a "guess" as to whether there were two people involved at the car wash. Although there were indications that Root was concerned about her daughters, she later clarified that her concern was for the shame her children were going to feel because of her actions. On this record, it does not appear that Root lost the capacity to make a voluntary decision to speak with the detectives because of threats directed at her daughters. *Id.*

The same is true of the detectives' references to the evidence against Root and the opinion that they would have to assume that she acted with premeditation. The fact that the detectives offered an opinion about the legal consequences of Root's acts, as suggested by the evidence, did not by itself amount to improper coercion; indeed, the detectives could properly suggest that Root's cooperation might result in a less severe penalty without rendering a subsequent confession involuntary. See *McKinney v Ludwick*, 649 F3d 484, 491-492 (CA 6, 2011). Even after Root conceded involvement in Kelly's death, she minimized her culpability. She indicated that Kelly's death was sudden and unexpected and that her efforts to cover up the crime were the result of panic and not indicative of premeditation. As such, the record shows that Root retained the presence of mind to assess the detectives' questions and provide carefully tailored answers. It does not appear that Root's decision to confess was the result of coercion. Rather, under the totality of the evidence, it appears that she voluntarily chose to confess to her involvement in Kelly's death. *Cipriano*, 431 Mich at 334.

Root voluntarily spoke to the detectives on April 27, 2015, and, were it not for the failure to give her the warnings required under *Miranda*, her entire statement would be admissible. However, because a reasonable person in Root's position would not have felt at liberty to end the interrogation after 2:52 p.m., the detectives had to advise her of her rights at that time. The detectives did not advise Root of her rights until about 4:35 p.m. Consequently, the statements that Root made from around 2:52 p.m. to the time she was advised of her rights at about 4:35 p.m. could not be used against her.

## E. HARMLESS ERROR

As already discussed, the trial court erred when it determined that Root was not in custody until she was formally arrested. It, for that reason, abused its discretion when it denied

-14-

Root's motion to exclude the statements that she made, but only for those statements she made between 2:52 p.m. and 4:35 p.m. We must next determine whether the admission of these statements was harmless beyond a reasonable doubt. See *People v Whitehead*, 238 Mich App 1, 9-10; 604 NW2d 737 (1999) (noting that the erroneous admission of a confession may be harmless error, and stating that "[p]utting defendant's confession aside, we must consider whether the other evidence adduced by the prosecutor was such that no reasonable juror would have accepted defendant's trial testimony or otherwise acquitted him.").

Root emphatically and repeatedly denied being involved in Kelly's death before her decision to confess after 2:52 p.m. After that point, she not only admitted to causing Kelly's death, but also admitted to details that suggested that she either intended to kill Kelly or at the least acted with knowledge that death was the likely result. Even accepting that the incriminating statements that Root made after 4:35 p.m. were admissible, those later statements do not clearly establish the mens rea for either first-degree premeditated murder or second-degree murder. See *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984) (stating that, to prove first-degree premeditated murder, the prosecution must prove that the defendant acted with the intent to kill and that the intent was deliberate and premeditated); *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (stating that the elements of second-degree murder are a death, caused by an act of the defendant, with malice, and without justification or excuse). Thus, while Root's properly admitted incriminating statements, along with all of the other evidence, strongly implicates her as being involved in Kelly's death, we cannot conclude that it was "so overwhelming that all reasonable jurors would have found guilt" in the form of first-degree premeditated murder "even without the confession being brought into evidence." *Whitehead*, 238 Mich App at 9. As such, the admission of Root's statements after the detectives should have advised her of her rights, but before they actually advised her of her rights, cannot be said to be harmless beyond a reasonable doubt. *Id*. at 9-10. Therefore, we must reverse and remand for a new trial.

Given our resolution of this issue, we decline to address Root's claim that the trial court erred when it denied her motion for a directed verdict. However, because her other claims of error might reoccur on remand, we shall briefly address them.

### III. EXPERT TESTIMONY

### A. STANDARD OF REVIEW

Root also argues on appeal that the trial court erred when it prevented her from presenting testimony by a forensic psychologist, Dr. Jeffrey Wendt, who would have testified about Root's personality traits. This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). However, this Court reviews de novo preliminary questions of law concerning the admission of evidence and reviews de novo whether the trial court properly interpreted the rules of evidence. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). A trial court necessarily abuses its discretion when it premises its decision on an error of law. *Yost*, 278 Mich App at 353.

B. ANALYSIS

A defendant has a constitutional right to present evidence in his or her own defense. *Id.* at 379. However, that right is not absolute. The defendant "must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984), quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

In *People v Carpenter*, 464 Mich 223, 232; 627 NW2d 276 (2001), our Supreme Court examined the continuing validity of the "so-called 'diminished capacity' defense," which allowed a defendant, "even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime." The Court traced the history of the diminished capacity defense and determined that it was improperly introduced into Michigan law over a clear policy choice by our Legislature to limit the circumstances under which a person may assert a lack of mental capacity to avoid or reduce criminal responsibility by negating specific intent. *Id.* at 236. For that reason, the Court rejected the continuing validity of the diminished capacity defense and held that "the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation." *Id.* at 239. Since the decision in *Carpenter*, this Court has clarified that a defendant may still offer testimony on his or her mental disorder or limited mental capabilities if offered for a purpose other than to avoid or reduce criminal responsibility by negating the intent element of an offense. *Yost*, 278 Mich App at 354-356.

In her motion to permit Wendt's testimony, Root claimed that Wendt's testimony did not implicate the diminished capacity defense barred by the decision in *Carpenter*. Instead, she argued, his testimony would show that her conduct during the relevant time was the result of panic. At the hearing, Root's lawyer reiterated this point: "[W]e are not claiming a lack of competence, nor are we claiming a lack of mental responsibility." Instead, her lawyer argued that he merely wanted to present Wendt's testimony to show that Root's personality was "non-assaultive, non-violent, doesn't seek conflict" and that the expert would be able to opine on that basis that she was guilty of a lesser "level of criminal responsibility" such as manslaughter rather than first-degree premeditated murder or second-degree murder. Root's lawyer even cited Wendt's report in which he opined that Root's test results showed that she was "passive, dependent, and handles problems through denial and repression rather than direct confrontation." He then opined that her efforts to conceal the crime were consistent with her pattern of repressing and denying distressing events. He also stated that her "passive personality" left her "less able to cope with stressful confrontation," which was also consistent with Root's claim that she did not "intentionally cause Ms. Kelly's death." The trial court, however, rejected Root's characterization of the proposed evidence, determined that the decision in *Carpenter* controlled, and barred the proposed testimony.

Although Root tried to frame Wendt's proposed testimony as something other than a diminished capacity defense, a fair reading of both the psychological report and Root's stated reason for the proposed testimony showed that she wanted to present the testimony to demonstrate that she was either incapable of forming, or unlikely to form, the intent to kill when involved in a stressful confrontation, such as allegedly occurred with Kelly. Root's own lawyer

argued that he wanted to present Wendt's testimony to show that Root was likely guilty of manslaughter, as opposed to first or second-degree murder, because she did not form the *intent* to kill—that is, he admitted that he wanted to present Wendt's testimony to attack the specific intent elements of first and second-degree murder. This is, in effect, a diminished capacity defense, which, as our Supreme Court has held, has no continuing validity in light of our Legislature's decision to limit defenses premised on a person's mental condition. *Carpenter*, 464 Mich at 239. To be sure, Wendt might have permissibly offered testimony about Root's mental condition to help educate the jury about a possible alternate explanation for the extreme behaviors that she engaged in to cover up Kelly's death. See, e.g., *Yost*, 278 Mich App at 356-358 (stating that testimony about the defendant's limited intellectual capacity could properly be admitted to educate the jury and show that her statements and actions were not evidence of guilt). But that was not her stated reason for presenting Wendt's testimony; Root wanted to have Wendt testify that her personality traits made it less likely that she would respond to a stressful confrontation by forming the intent to kill. However framed, such testimony implicated diminished capacity. The trial court, therefore, did not err when it precluded Root from offering such testimony at trial. *Carpenter*, 464 Mich at 239.

Root also argues that, to the extent that the trial court did not err when it determined that the decision in *Carpenter* barred Wendt from testifying in the way that she desired, that decision violates the United States Constitution. More specifically, she maintains that it violates due process by precluding her from contesting the culpability element of the criminal charge. Our Supreme Court, however, considered that very issue in *Carpenter* and, relying on precedent from the United States Supreme Court, determined that the Legislature could constitutionally limit the use of the diminished capacity defense. See *Carpenter*, 464 Mich at 240-241, citing *Fisher v United States*, 328 US 463; 66 S Ct 1318; 90 L Ed 1382 (1946). Moreover, this Court has no authority to disregard our Supreme Court's decision in *Carpenter*. *Carpenter* controls unless and until our Supreme Court modifies it or it is overruled by the Supreme Court of the United States. See *Associated Builders & Contractors v City of Lansing*, 499 Mich 177, 192-193; 880 NW 2d 765 (2016).

The trial court did not abuse its discretion when it precluded Root from offering Wendt's testimony to attack the specific intent elements of first and second-degree murder.

## IV. OPINION TESTIMONY

Root also argues that the trial court erred when it overruled her objection to Brace's testimony that he was not being truthful with Root when he told her that he did not think that she was guilty of first-degree murder during her interrogation. Although Brace could testify that his statement was just an interview tactic, his statement that he did not actually believe what he told Root during the interview amounted to an impermissible statement of his belief about Root's guilt. See *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). Therefore, although the error did not warrant relief, the trial court should have instructed the jury about this improper testimony and should prevent a recurrence in Root's new trial.

## V. REDACT STATEMENTS

Finally, Root argues that the trial court erred when it denied her request to exclude a portion of the otherwise admissible statement that she made on April 27, 2015. More specifically, she argues that the jury should not have been allowed to hear her statements that she had repeatedly lied to her boyfriend over a period of years about whether her children were her own children and about being a member of a prominent family from West Michigan. These statements, she claims, were not relevant and the prejudicial effect substantially outweighed any probative value that the statements might have had. This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *Yost*, 278 Mich App at 353. However, this Court reviews de novo preliminary questions of law concerning the admission of evidence and reviews de novo whether the trial court properly interpreted the rules of evidence. *Duncan*, 494 Mich at 723.

During the interrogation of April 27, 2015, the detectives asked Root whether she was a truthful person and she stated that she believed she was truthful. She then conceded that everyone lies occasionally and then discussed her understanding of what it means to be truthful. She later discussed at length how she lied to her then boyfriend about her children and about being a member of the prominent family.

Relevant evidence is admissible. MRE 402. "Determining whether a statement is relevant requires a trial court to carefully scrutinize whether the statement is both material—i.e., offered to help prove a proposition which is . . . a matter in issue—and probative—i.e., tends to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence." *People v Musser*, 494 Mich 337, 355; 835 NW2d 319, 330-31 (2013) (quotation marks and citation omitted); MRE 401, 403. Evidence is unfairly prejudicial when there is a danger that marginally probative evidence will be given undue or preemptive weight. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995).

In the instant case, because Root's discussion of her penchant for fabricating stories directly related to her assertion that she was truthful, which she did not seek to have redacted, and implicated the credibility of her statements to the detectives, it was relevant to the jury's assessment of the weight and credibility to be afforded her statements. Root's statements implicated her truthfulness and suggested that she used elaborate stories to manipulate the persons in her life. Root's explanation that she thought it was okay to lie to her boyfriend for years about whether her children were her own biological children and to lie about being a member of a prominent family were highly probative of her credibility. With this information, the jury could better understand and evaluate the statements that Root made to detectives both at the time of Kelly's death and during her later interviews. Moreover, although clearly damaging to her credibility, Root had the opportunity to explain the reasons for her decision to lie and those reasons also shed light on her credibility. Thus, taken as a whole, we cannot say that unfair prejudice substantially outweighed the probative value of these statements. *Id.* at 76. Consequently, the trial court did not abuse its discretion when it denied Root's request to preclude these statements. *Yost*, 278 Mich App at 353.

## VI. CONCLUSION

The trial court erred when it determined that Root was not in custody before being formally told that she was under arrest. A reasonable person in Root's position would not have felt at liberty to end the interrogation and leave by about 2:52 p.m. As such, the detectives should have advised Root of her rights consistent with *Miranda* and, because they did not, her statements after that point were inadmissible. However, Root's statements were otherwise the product of her free will. Accordingly, the statements that she made before 2:52 p.m. and after the detectives advised her of her rights at about 4:35 p.m. were admissible. Nevertheless, because it cannot be said that the erroneous admission of the inadmissible statements was harmless beyond a reasonable doubt, Root is entitled to a new trial.

Vacated and remanded for a new trial consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering