Young, J.
Defendant presented evidence at his bench trial that, although not legally insane, he lacked the mental capacity to form the specific intent required for the crimes of first-degree home invasion, MCL 750.110a(2), and felonious assault, MCL 750.82. The trial court found defendant guilty of both offenses, and the Court of Appeals affirmed.
We originally granted leave to consider whether the lower courts properly determined that it was defendant’s burden to establish his diminished capacity defense by a preponderance of the evidence under *226 MCL 768.21a. However, we are now persuaded by the prosecution’s argument that, by enacting a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation, the Legislature has signified its intent not to allow a defendant to introduce evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent.[1] Therefore, we affirm the decision of the Court of Appeals on that basis.
I. FACTUAL AND PROCEDURAL BACKGROUND
The events giving rise to defendant’s convictions took place in the early morning of July 9, 1995. After attending a dance at a local community hall, complainants Audrey Thomas and Aron Blakely returned to Thomas’ home in Saginaw at approximately 2:00 A.M.[2]
Thomas and Blakely were sitting in the family room when Thomas heard the doorbell ring. Thomas discovered that defendant was at the door. Defendant demanded to be let in, yelling that Blakely should “come on out” and that Thomas was his “woman.” When Thomas refused to admit him, defendant eventually crashed through a window. Defendant produced a handgun and fired two shots in the general direction of Thomas and Blakely. Neither was hit. Blakely then announced that he was leaving. As *227 defendant opened the door for him, defendant struck Blakely in the face with his fist. Although defendant initially walked out the front door with Blakely, he immediately returned to the house where he confronted Thomas, striking her head with the butt of his gun. The blow apparently caused the gun to discharge a third time. Blakely heard the shot and went next door to call the police.
Defendant eventually fled the scene and drove to his nearby home. He immediately called Thomas and threatened her. Several police officers arrived at defendant’s home a short time later. A stand-off ensued, during which defendant threatened to shoot himself and any officers who attempted to enter the house. Saginaw Police Sergeant Tern Johnson-Wise established telephone contact with defendant and spoke with him several times. She testified that defendant was yelling and screaming initially, and that when he calmed down he began talking about demons and “money that was stolen from him.”
At some point, defendant asked for some heart medication that was in his truck. Saginaw Police Officer Daniel Kuhn lured him to a window by offering to give defendant his medication. When Officer Kuhn tried to grab defendant through the open window, defendant got free and slammed the window on Officer Kuhn’s fingers. Defendant eventually allowed the officers to enter and he was placed under arrest. He was subsequently charged with first-degree home invasion, MCL 750.110a(2), two counts of assault with intent to commit murder, MCL 750.83, being a felon in possession of a firearm, MCL 750.224f, possession of a firearm during the commission of a felony, MCL *228 750.227b, and resisting and obstructing a police officer, MCL 750.479.
At his bench trial, defendant presented a diminished capacity defense. In addition to several lay witnesses that testified that he had been drinking before the incident and that he appeared intoxicated, defendant presented a report from Kingswood Hospital, where he had been treated approximately a month after the incident. The report described him as being “delusional” and indicated that he suffered from organic brain damage. The report further described his conduct upon admission to the hospital:
He stated that his son had been killed in April 1995 and “they had broken into my computer.” He says that he has special forces that are guarding him; that people are stealing money from his son’s records. He also hears voices telling him that people are looking and laughing at him. . . . He is afraid that someone is trying to poison him. He talks of the organization that is manipulating him and that someone has put “voodoo dolls” on him.
Defendant also presented expert testimony from Dr. Michael Abramsky, a board-certified clinical and forensic psychologist. Dr. Abramsky testified that defendant’s bizarre behavior at the time of the shooting and ensuing stand-off “suggests that he was mentally ill at the time” and that defendant’s drug-induced organic brain damage,[3] combined with his ingestion of alcohol and various prescription drugs, was the likely cause not only of his behavior but his claimed loss of memory of the incident. In sum, Dr. Abramsky believed that defendant suffered from diminished *229 capacity and that he therefore could not formulate a specific intent.
In rebuttal, the prosecution presented the testimony of Dr. George Watson of the Center for Forensic Psychiatry. Although he acknowledged defendant’s apparent organic brain damage, Dr. Watson .did not believe defendant to be obviously and acutely psychotic. Instead, on the basis of his clinical interview, Dr. Watson believed “that the possibility of Mr. Carpenter exaggerating appeared to be more likely
In a comprehensive written opinion, the trial court issued its findings. The court found defendant guilty of resisting and obstructing a police officer and being a felon in possession of a firearm. Regarding the two counts of assault with intent to commit murder, the court found that the prosecution had failed to prove that defendant intended to kill either victim. Instead, the court found that the evidence only supported a finding of guilt on the lesser offense of felonious assault. Finally, the trial court found defendant guilty as charged of both first-degree home invasion and possession of a firearm during the commission of . a felony.
The court proceeded to address and reject defendant’s diminished capacity defense:
The [c]ourt does not find that the defendant has supported his burden of proof of diminished capacity by a preponderance of the evidence: His actions seem very' “goal oriented” .... His actions in driving to Ms. Thomas’s home, his ringing the door bell, the epitaphs [sic] of displeasure, his entry into Ms. Thomas’s home, his aiming the gun, his shots into the ceiling and near the ceiling scaring the victims, his striking Mr. Blakely and Ms. Thomas, his departure from the home, and significantly, his threatening phone *230 call back to [Ms.] Thomas, all suggest very goal oriented actions consistent with the capacity to form a specific intent.
The trial court eventually sentenced defendant to the foüowing prison terms: twenty-eight months to twenty years for the home invasion conviction, twenty-eight months to four years for each of the felonious assault convictions, twenty-eight months to five years for the felon-in-possession conviction, and one to two years for the resisting and obstructing conviction. The court further ordered that these sentences be served consecutive to the mandatory two-year term for the felony-firearm conviction.
In affirming defendant’s convictions and sentences, the Court of Appeals rejected defendant’s argument that the trial court erred in shifting the burden to defendant to prove his claim of diminished capacity by a preponderance of the evidence.[4]
This Court granted defendant’s application for leave to appeal. 462 Mich 912 (2000).
H. STANDARD OF REVIEW
The proper application of MCL 768.21a is a question of law subject to de novo review. People v Rodriguez, 463 Mich 466, 471; 620 NW2d 13 (2000).
m. THE TRADITIONAL INSANITY DEFENSE
In Michigan, use of the insanity defense has been governed by statute since 1975. 1975 PA 180. Legal insanity is an affirmative defense requiring proof that, *231 as a result of mental illness or being mentally retarded as defined in the mental health code, the defendant lacked “substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law.” MCL 768.21a(l).[5] Importantly, the statute provides that “[t]he defendant has the burden of proving the defense of insanity by a preponderance of the evidence.” MCL 768.21a(3) (emphasis added).
There are also several procedural requirements that must be satisfied before an insanity defense may be raised. We recently summarized those requirements in People v Toma, 462 Mich 281, 292, n 6; 613 NW2d 694 (2000):
A defendant in a felony case who wishes to interpose an insanity defense, must serve written notice on the court and the prosecutor not less than thirty days before trial and submit to a court-ordered examination, relating to the claim of insanity, by personnel for the center for forensic psychiatry or other qualified personnel. MCL 768.20a(l) and (2); MSA 28.1043(1)(1) and (2). A defendant or the prosecutor may also obtain independent psychiatric examinations. MCL 768.20a(3); MSA 28.1043(1)(3). The failure by the defendant to fully cooperate in either the court-directed or independent examinations, bars the defendant from presenting testimony relating to insanity at trial. MCL 768.20a(4); MSA 28.1043(1)(4).
Finally, MCL 768.36 sets forth the consequences of a jury’s finding that a defendant is guilty of an offense *232 and that, although the defendant was mentally ill at the time the offense charged was committed, the defendant was not legally insane. If a defendant is found “guilty but mentally ill,” the trial court “shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense.” MCL 768.36(3). If incarcerated, the defendant must “undergo further evaluation and be given such treatment as is psychiatrically indicated for his mental illness or retardation.” Id. If the defendant is placed on probation, “the trial judge, upon recommendation of the center for forensic psychiatry, shall make treatment a condition of probation.” MCL 768.36(4).
IV. THE “DIMINISHED CAPACITY” DEFENSE
As defined by our Court of Appeals, the so-called “diminished capacity” defense allows a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime. See, e.g., People v Jones, 151 Mich App 1, 5-6; 390 NW2d 189 (1986). “[T]he theory is that if because of mental disease or defect a defendant cannot form the specific state of mind required as an essential element of a crime, he may be convicted only of a lower grade of the offense not requiring that particular mental element.” Chestnut v State, 538 So 2d 820, 822 (Fla, 1989) (citation omitted).
This Court has several times acknowledged in passing the concept of the diminished capacity defense. See, e.g., People v Lloyd, 459 Mich 433; 590 NW2d 738 (1999) (holding that defense counsel was not constitutionally ineffective for presenting a diminished ca *233 pacity defense as opposed to a defense of legal insanity); People v Pickens, 446 Mich 298; 521 NW2d 797 (1994) (holding that the defendant was not prejudiced by counsel’s failure to pursue a diminished capacity defense); People v Griffin, 433 Mich 860; 444 NW2d 139 (1989) (remanding for a hearing on the defendant’s claim that trial counsel was ineffective for failing to explore defenses of diminished capacity and insanity). However, we have never specifically authorized its use in Michigan courts.
Instead, it was our Court of Appeals, in People v Lynch, 47 Mich App 8; 208 NW2d 656 (1973), that introduced to Michigan the diminished capacity defense. The defendant in Lynch was charged with having murdered her baby by starvation. As part of her defense, the defendant sought to have admitted into evidence testimony from two psychiatrists supporting her claim that she did not possess the requisite intent to be convicted of first-degree murder, MCL 750.316. The trial court refused to admit the evidence on the ground that the defendant had never raised an insanity defense and did not give the required statutory notice.[6]
In reversing the defendant’s jury conviction, the Court of Appeals rejected the prosecution’s argument that allowing evidence of mental illness less than insanity as bearing on the defendant’s capacity to form the intent required to commit a particular crime would “sanction a subterfuge” avoiding the standards of the insanity defense enunciated by this Court in *234 People v Durfee, 62 Mich 487; 29 NW 109 (1886).[7] The Court also disagreed that recognizing a diminished capacity defense separate from legal insanity “would permit the defense to in effect sneak in the insanity defense without labeling it as such and without the necessity of complying with the notice statute as to the insanity defense.” Lynch, supra at 20. While it acknowledged that some states viewed mental capacity as “an all or nothing matter and that only insanity . . . negates criminal intent,” the Court of Appeals concluded that proof of diminished capacity is admissible as “bearing on intent generally or at least on those special states of mind where a specific intent is required or whether the state of mind by definition determines the degree of offense as here.” Id.
In People v Mangiapane, 85 Mich App 379; 271 NW2d 240 (1978), the Court of Appeals had occasion to address the diminished capacity concept under the current statutory framework established by 1975 PA 180. In Mangiapane, the defendant sought to introduce psychiatric testimony on the issue of his capac *235 ity to form the specific intent to commit assault with intent to commit murder in violation of MCL 750.83. The trial court denied the request on the ground that the defendant did not raise the defense and give the prosecution notice under MCL 768.20a.
The Court of Appeals affirmed, explaining that, by enacting 1975 PA Í80, the Legislature intended “to bring under one procedural blanket all defenses to criminal charges that rest upon legal insanity as defined in the statute,” and that “the defense known as diminished capacity comes within th[e] codified definition of legal insanity.” Id. at 394-395. Thus, the Court held that, in order to introduce evidence that, although not legally insane, the defendant lacked mental capacity to form specific intent, the defendant had to fully comply with the statutory insanity defense provisions. Id. at 395-396.
The Court of Appeals decision in Mangiapane was then followed by a series of decisions continuing to address diminished capacity defense as a form of the statutory insanity defense. See, e.g., People v Denton, 138 Mich App 568; 360 NW2d 245 (1984); People v Anderson, 166 Mich App 455; 421 NW2d 200 (1988).
Consistent with this line of cases, the Court of Appeals held that a defendant seeking to present a diminished capacity defense bears the burden of establishing such a defense by a preponderance of the evidence under MCL 768.21a(3), which took effect on October 1, 1994. Defendant challenges that holding, arguing that nothing in the language of § 21a suggests a legislative intent to place on defendants the burden of proving diminished capacity.
We agree with defendant that there is no indication in § 21a that the Legislature intended to make dimin *236 ished capacity an affirmative defense. However, that is only because, as explained below, the Legislature’s enactment of a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation demonstrates the Legislature’s intent to preclude the use of any evidence of a defendant’s lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent.
V. THE CONTINUED VIABILITY OF THE DIMINISHED CAPACITY DEFENSE IN MICHIGAN
Since its inception in the United States, the diminished capacity defense has been the subject of much debate.[8] At present, there is a wide divergence of views among the states concerning the admissibility of evidence of mental illness short of insanity. See, generally, 1 Robinson, Criminal Law Defenses, § 64(a), pp 272-279. A common criticism is that the subtle gradations of mental illness recognized in the psychiatric field are of little utility in determining criminal responsibility:
“[T]o the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the *237 culpability of the accused. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane.” [State v Bouwman, 328 NW2d 703, 706 (Minn, 1982) (citations omitted).]
In State v Wilcox, 70 Ohio St 2d 182, 192-193; 436 NE2d 523 (1982), the court expressed a similar view:
Theoretically the insanity concept operates as a bright line test separating the criminally responsible from the criminally irresponsible. The diminished capacity concept on the other hand posits a series of rather blurry lines representing gradations of culpability.
We need not join the affray because we agree with the prosecution that our Legislature, by enacting the comprehensive statutory framework described above, has already conclusively determined when mental incapacity can serve as a basis for relieving one from criminal responsibility. We conclude that, through this framework, the Legislature has created an all or nothing insanity defense. Central to our holding is the fact that the Legislature has already contemplated and addressed situations involving persons who are mentally ill or retarded yet not legally insane. As noted above, such a person may be found “guilty but mentally ill” and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric evaluation and treatment. MCL 768.36(3). Through this statutory provision, the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent.
*238 As a final matter, we note that even persons acquitted of an offense by reason of insanity may be confined and required to undergo evaluation and treatment. MCL 330.2050. As we explained in People v Webb, 458 Mich 265, 281; 580 NW2d 884 (1998), MCL 330.2050 is “a measure to promote public safety. Persons acquitted by reason of insanity, particularly where the facts are grave, cannot be allowed simply to walk out the front door of the courthouse. The statute is clearly designed to establish a procedure by which it can be determined whether the person can safely reenter society.” We agree with the Supreme Court of Wisconsin that
[w]here . . . the statutes provide that a person found not guilty by reason of insanity is to be committed to a mental treatment facility until recovered and until his return to society presents no danger to the public, the introduction of evidence of mental condition on the question of impaired capacity to form intent during the guilt phase of the trial could well be required to acquit the defendant, sane or insane, without ever inquiring into the issue of sanity and without regard to the provisions of the statute requiring treatment of those pleading and establishing insanity. [Steele v State, 97 Wis 2d 72, 91; 294 NW2d 2 (1980) (citation omitted).]
Similar sentiments were expressed in Bethea v United States, 365 A2d 64, 90-91 (DC App, 1976), a decision that is widely cited for the view that the diminished capacity defense should be rejected:
Under the present statutory scheme, a successful plea of insanity avoids a conviction, but confronts the accused with the very real possibility of prolonged therapeutic confinement. If, however, psychiatric testimony were generally admissible to cast a reasonable doubt upon whatever degree of mens rea was necessary for the charged offense, *239 thus resulting in outright acquittal, there would be scant reason indeed for a defendant to risk such confinement by arguing the greater form of mental deficiency. Thus, quite apart from the argument that the diminished capacity doctrine would result in a considerably greater likelihood of acquittal for those who by traditional standards would be held responsible, the future safety of the offender as well as the community would be jeopardized by the possibility that one who is genuinely dangerous might obtain his complete freedom merely by applying his psychiatric evidence to the threshold issue of intent.
Like the Supreme Court of Ohio, we decline to adopt an alternative defense to legal insanity “that could swallow up the insanity defense and its attendant commitment provisions.” Wilcox, supra at 189. “[T]he concepts of both diminished capacity and insanity involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment.” Bethea, supra at 90, n 55.[9] Accordingly, we hold that the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation.[10]
*240 Defendant, however, maintains that it would violate due process to preclude a defendant from introducing evidence that, although not legally insane, he lacked the mental capacity to form a specific intent. The United States Supreme Court’s decision in Fisher v United States, 328 US 463; 66 S Ct 1318; 90 L Ed 1382 (1946), dispositively answers this contention in the negative. The defendant in Fisher sought an instruction in his District of Columbia murder trial that would have permitted the jury “to weigh evidence of his mental deficiencies, which were short of insanity in the legal sense, in determining the fact of and the accused’s capacity for premeditation and deliberation.” Id. at 470. In upholding the refusal of the trial court to give such an instruction, the Supreme Court noted that “[f]or this Court to force the District of Columbia to adopt such a requirement for criminal trials would involve a fundamental change in the common law theory of responsibility.” Id. at 476. The Court concluded that
[s]uch a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in matters not affected by Constitutional limitations or a general federal law is a matter peculiarly of local concern. [Id. at 476.]
Given the clear message of the Court’s decision in Fisher, the reliance by both defendant and the dissent on other United States Supreme Court decisions not *241 addressing the issue presented here is not persuasive. Indeed, the Seventh Circuit Court of Appeals relied on Fisher to reach the same decision we do today: “[A] state is not constitutionally compelled to recognize the doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent.” Muench v Israel, 715 F2d 1124, 1144-1145 (CA 7, 1982); see also Mott, supra at 541 (“Fisher stands for the proposition that state legislatures, without violating the constitution, may preclude defendants from offering evidence of mental and psychological deficiencies to challenge the elements of a crime”).
VI. CONCLUSION
The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant’s lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. Consequently, we affirm the decision of the Court of Appeals on this alternative basis.
Corrigan, C.J., and Weaver, Taylor, and Markman, JJ., concurred with Young, J.

 Defendant’s motion to strike the prosecution’s brief raising this issue is denied.

 Thomas and defendant previously had a long-term relationship. A child was the product of that relationship.

 Defendant has a history of marijuana and cocaine abuse.

 Unpublished opinion per curiam, issued July 16, 1999 (Docket No. 204051).

 However, “[a]n individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.” MCL 768.21a(2).

 At the time Lynch was decided, the notice provision for raising an insanity defense was contained in MCL 768.20.

 Before the Legislature’s enactment of 1975 PA 180, the test for determining legal insanity was controlled by Durfee. The Durfee test, in turn, was based in part on the M’Naghten rule: “ ‘[A]t the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.’ ” People v Martin, 386 Mich 407, 415; 192 NW2d 215 (1971), quoting Daniel M’Naghten’s Case, (HL 1843) 10 Cl Fin 200 (8 Eng Rep 718), 722 (1843).
In addition to the M’Naghten rule, which focuses solely on a defendant’s cognitive abilities, the Durfee Court added a volitional component asking whether the defendant’s mental disease or abnormality prevented him from controlling his actions. This second component has commonly been referred to as the “irresistible impulse” test. In Martin, supra at 418, we explained the “salient elements” of the Durfee test as follows: “1) whether defendant knew what he was doing was right or wrong; and 2) if he did, did he have the power, the will power, to resist doing the wrongful act?”

 It apparently is well recognized that the diminished capacity defense originated in Scotland in 1867. See State v Wilcox, 70 Ohio St 2d 182; 436 NE2d 523 (1982); Arenella, The diminished capacity and diminished responsibility defenses: Two children of a doomed marriage, 77 Columbia L R 827, 830, n 16 (1977). The state of California, in turn, is considered to be the jurisdiction that pioneered the defense in the United States. Wilcox, supra at 187; see also State v Sessions, 645 P2d 643, 644, n 2 (Utah, 1982) (“[People v Wells, 33 Cal 2d 330; 202 P2d 53 (1949)] is credited with beginning the diminished capacity in California”).

 It is for this reason that we find to be irrelevant the largely procedural distinction between the affirmative defense of legal insanity and the use of diminished capacity evidence. In either case, a defendant is attempting to avoid responsibility for his actions. In our view, the Legislature, by adopting a comprehensive framework concerning mental illness and retardation as it relates to criminal responsibility, has established that defendants suffering from mental deficiencies amounting to legal insanity “should be acquitted on that ground and treated for their disease. Persons with less serious mental deficiencies should be accountable for their crimes just as everyone else.” Chestnut, supra at 825.

 We decline the dissent’s invitation to address our prior decisions recognizing voluntary intoxication as negating specific intent, see, e.g., People v Langworthy, 416 Mich 630; 331 NW2d 171 (1982), as the continued validity of that separate and distinct defense is not before us. While defendant presented evidence that he had been drinking on the night of the offense and that he was taking various prescription drugs, there was no *240 defense claim that intoxication alone precluded defendant from being able to form the requisite specific intent. Rather, the entire defense was based upon defendant’s apparent organic brain damage. Indeed, defendant’s own expert testified that this was not just a case in which “someone went out and drank.”