*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
August 20, 2020

v

No. 346668
Macomb Circuit Court
LC No. 2017-002784-FC

JULIE ANN FLYNN,

        Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right her jury trial conviction of guilty but mentally ill on one count of first-degree murder, MCL 750.316. Defendant was sentenced to life imprisonment without the possibility of parole. We affirm.

This case arises out of the death of defendant's mother ("the victim" herein). Defendant stabbed the victim while in the condominium the two lived in together in Shelby Township, Michigan. Defendant has a history of severe mental illness. She had been diagnosed as schizophrenic, and had been taking antipsychotic medication for approximately 20 years.

Defendant and the victim had been living alone together in their condominium since November 27, 2016, when defendant's father, Bill Flynn, unexpectedly died. Bill had been the caretaker for the victim and defendant. Bill had moved defendant into his and the victim's condominium in 2015, primarily to ensure that defendant took her medications and attended her doctor's appointments. On January 30, 2017, defendant called her brother, Steven Flynn, and reported that their mother was dead. The victim's body was found sitting on the couch, covered with a blanket. Kelly Flynn, defendant's sister-in-law, testified that the scene appeared staged because it seemed that the carpet had been cleaned, and the victim's body appeared to be in an unnatural position. When the paramedic, Curtis Allen Pallister, arrived at the condominium, he pronounced the victim deceased. Pallister testified that nothing he observed in the condominium seemed abnormal, and it appeared as if the victim could have died from natural causes.

Dr. Daniel Spitz performed an autopsy on the victim on January 31, 2017. The victim had multiple stab wounds to the right side of her neck. The victim's cause of death was homicide by

at least 22 stab wounds to her neck that caused damage to the carotid artery and the jugular vein. Dr. Spitz believed that, at the time she was found, the victim "had been dead sometime in the range of two to three days, maybe a little more[.]" The victim had no defensive wounds on her body, which can occur when a person tries to defend himself or herself during a struggle. If there was any movement by the victim when being stabbed, it was very minimal.

The prosecution charged defendant with first-degree murder. At trial, the defense set forth the affirmative defense that defendant was legally insane at the time she killed the victim, and therefore, the jury should find defendant not guilty by reason of insanity. The jury returned a verdict of guilty but mentally ill. Defendant now appeals.

Defendant first argues that her conviction and sentence for first-degree murder should be vacated because she presented sufficient evidence to establish that she was legally insane at the time the crime was committed. We disagree.

This Court reviews a sufficiency of the evidence challenge de novo. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). "When a defendant challenges the sufficiency of the evidence in a criminal case, this Court considers whether the evidence, viewed in a light most favorable to the prosecution, would warrant a reasonable juror in finding that the essential elements of the crime were proved beyond a reasonable doubt." *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011). "The defendant has the burden of proving the defense of insanity by a preponderance of the evidence." MCL 768.21a(3). It is a question for the jury whether the defendant has sufficiently supported an affirmative defense by a preponderance of the evidence. *People v Kolanek*, 491 Mich 382, 411-412; 817 NW2d 528 (2012), superseded by statute on other grounds as stated in *People v Hartwick*, 498 Mich 192, 231 (2015). "It is the province of the jury to determine questions of fact and assess the credibility of witnesses." *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998).

Insanity is an affirmative defense. MCL 768.21a(1). A defendant may be found not guilty by reason of insanity if the defendant establishes that, as a result of a mental illness, "the defendant 'lacked substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law.' " *People v Carpenter*, 464 Mich 223, 230-231; 627 NW2d 276 (2001), quoting MCL 768.21a(1). However, a defendant may be found guilty but mentally ill if the defendant establishes that "he or she was mentally ill at the time of the commission of that offense," but has not established "by a preponderance of the evidence that he or she lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." MCL 768.36(b) and (c).

Defendant does not dispute that the prosecution presented sufficient evidence of first-degree murder. Rather, defendant contends that she presented sufficient evidence that she was legally insane at the time of the crime. The parties do not dispute that defendant was mentally ill at the time she killed the victim. Therefore, the pertinent question is whether she proved, by a preponderance of the evidence, that she lacked substantial capacity to either appreciate the nature and quality or wrongfulness of her conduct or to conform her conduct to the requirements of the law.

The evidence established that defendant had a long history of mental illness. Dr. Judith Block, who evaluated defendant for criminal responsibility, testified that defendant had been taking psychiatric medications since she was 28 years old when she had her first breakdown. Her medications were almost always antipsychotic medications, which are used with people who are out of touch with reality, psychotic, have disorganized thinking, and sometimes have delusions of false things or hear voices. In 2012, defendant was diagnosed as having schizophrenia because she had oddities of thought perception, sleep disturbances, illogical thinking, loosening of associations, delusions or hallucinations, hostility and irritability, difficulty thinking, and indications of psychosis and disorganization. Between 2009 and 2012, defendant was admitted for inpatient hospitalization seven times. In 2015, defendant had an episode and "rammed into a bunch of vehicles," causing a multi-car accident. Defendant gave up driving and moved in with Bill and the victim. In January 2016, defendant was admitted to the hospital after Bill and the victim called the police because defendant was delusional, paranoid, and threatening to kill herself with a knife. According to Bill and the victim, defendant had refused to take her medication for a few days before the incident. Dr. Block noted that this showed how fast defendant could decompensate when not having her medication for only a few days. Defendant was admitted to the hospital again in February 2016 after she cut her wrists.

Kelly testified that in 2009 she noticed a serious decline in defendant's health. Defendant had become verbally aggressive and "completely delusional." Defendant would accuse Kelly of things that had no basis in reality, and at times, defendant would look at Kelly, but it appeared she was talking to someone else. Kelly stopped communicating with defendant over the phone because she felt that it was not defendant anymore, "it was somebody else." When Kelly personally witnessed defendant's episodes, it appeared that defendant was someone else. Kelly only personally saw one disagreement between defendant and the victim.

At trial, multiple witnesses testified to defendant's bizarre behavior around the time of the victim's death. Dr. Block testified that, on January 13, 2017, defendant spoke to the person who rented defendant's other home. Between January 13, 2017, and January 27, 2017, the renter could not get ahold of defendant despite numerous phone calls and emails. When the renter finally got ahold of defendant, she told him to come by the next morning and she would sign paperwork for him. When the renter arrived in the morning of January 28, 2017, defendant was disheveled, shaking, and wearing what appeared to be a stained robe. Defendant was unaware of the month. On January 29, 2017, defendant called her friend, Deborah Adams-Budden, and asked what a person does when both of their parents are dead. Adams-Budden told defendant to call the police, and defendant agreed. Defendant was emotionless and evasive when speaking to Adams-Budden. Adams-Budden also said she would come by the following day, and defendant appeared happy that someone would come over to help her. On January 29, 2017, defendant placed a call to 911, expressing that "there was a lot going on," but when the police arrived to do a welfare check, defendant did not answer the door. Rather, defendant closed the blinds when the police asked if she was okay and if she would let them in the condominium. When defendant spoke to Adams-Budden on the morning of January 30, 2017, she was not certain whether she had called the police. On January 30, 2017, defendant spoke to Steven in the morning, and said, "dad's dead, mom's dead, we need to put mom in an urn just like dad." When Steven arrived at the house, defendant was "zombie like." When Kelly spoke to defendant at the house, defendant appeared to have no emotion, she was "completely detached," and "[j]ust kind of rocking and staring." Over time Kelly

had learned that when defendant was emotionless, had a fixed stare, and had a slight rock, she was experiencing an episode. When Officer Michelle Adamic attempted to speak to defendant while at the scene, defendant was emotionless and did not make eye contact. When Officer Justin Goebel tried to speak to defendant twice while at the scene, she was emotionless and made little eye contact. Officer Goebel thought defendant appeared disheveled, but she seemed coherent.

During Dr. Block's evaluation of defendant, defendant stated that she killed the victim because the victim was in pain. When Dr. Block asked defendant about killing the victim, defendant said, "my mom said, if I didn't have a stent in my heart, I wouldn't be alive and I'm in a lot of pain[.]" Defendant then stated, "I didn't act appropriately, I should have called 911." Defendant also stated that she felt she was in the middle of a dream at the time of the victim's death. Defendant told Dr. Block that she "believed someone was controlling her thoughts or controlling her," saying, "I remember dreaming about a man, a crazy dream, I believe it was at the time of my mother's death, just a crazy dream." When Dr. Block asked defendant whether she would have killed the victim if she was not in the dream, defendant responded, "no, if I was in a delusional state, I would have just gone to bed and I would wake up and care for her and me, for both of us." When asked if she knew what she did was wrong, defendant responded, "I know it is wrong, I have love and remorse, looking back I don't recall stabbing 20 times, I had a loving relationship with her, she was my friend[.]" Dr. Block believed that defendant's statement that she killed the victim because the victim was in pain was actually defendant trying to rationalize her behavior because she did not actually remember what occurred during that period of time because she was experiencing a psychotic episode, and defendant had a history of not being able to remember events during a psychotic episode. Dr. Block asserted that, when people are authentically mentally ill, and don't want to acknowledge the "crazy" stuff they do when they are mentally ill, they try "to come up with a logical thing that they did because they don't want to acknowledge the insanity and lack of control."

In regard to a diagnosis, Dr. Block stated that it was a "slam dunk" that defendant was mentally ill at the time of the crime on the basis of defendant's history of mental illness, defendant's account of what happened, and defendant's failure to attend to her hygiene during that time period as illustrated by her wearing a bloody robe for days. Dr. Block also opined that defendant could not appreciate the nature and quality or the wrongfulness of what she did on the basis of defendant's statements that she was in a dream, and on the basis of her bizarre behavior around the time of the victim's death. Dr. Block considered not only defendant's extensive history of mental illness, but also the account of others who saw her around that time. Dr. Block stated that defendant likely committed the crime sometime before Saturday morning, "based on the brown stains on her robe," but even after Saturday she continued to have bizarre behavior as illustrated by her conversation with Adams-Budden, as well as the way in which she ignored the police after she called them. Dr. Block stated that there was no real way of knowing whether defendant knew that killing the victim was wrong because she was "very out of touch with reality at the time." Dr. Block also opined that defendant could not conform her conduct to the requirements of the law because defendant did not appear to have goal oriented or organized behavior stating, "[i]t seems pretty random to kill, and then sit around and do cleaning and in a not great fashion where there is still blood on your robe. You don't change your clothes, you don't wash your clothes, you got blood everywhere. You got the toilet stuffed up, it sounds like a chaotic disorganized way of trying to clean up[.]"

On cross-examination, the prosecutor tried to discredit Dr. Block's testimony expressing that, despite Dr. Block's repeated statements that defendant continued to wear a robe with blood on it, the robe had been tested and it did not have blood on it. The prosecutor stated to Dr. Block the following:

> I'm kind of curious because it's supposed to be a really bloody crime scene and when she's arrested days later she's not wearing any clothes that have blood on them. You want to say disheveled, yet she's clean. Does that tell you that she was functioning at a point where she would have washed her bloody clothes, or gotten out of her bloody clothes, or thrown out her bloody clothes, or disposed of her bloody clothes?

Dr. Block was unaware that the stains had been determined not to be blood. The prosecutor questioned Dr. Block as to whether defendant was truly incapable of recounting what occurred when she killed the victim or whether she was just unwilling to recount the events and being manipulative. Dr. Block stated that, although defendant had the ability to manipulate, she did not believe defendant was being manipulative during the evaluation because her inability to recount details was consistent with her history of being a poor historian when it came to her mental health.

The prosecutor also questioned Dr. Block as to how a person could be in a schizophrenic state and have no recollection of events but could have cleaned the scene to such an extent that minimal blood was seen by the paramedics and could have placed the victim's body so that her injuries did not show. Dr. Block believed that it was possible in some cases, and specifically in defendant's case, that she likely did not have a recollection of what occurred. Dr. Block expounded on the issue by stating that defendant did not solely say that she could not remember, but rather, she was in a dream and being controlled by a man. When prompted by the prosecutor, Dr. Block stated that, although she had read nine other reports for defendant, the first time defendant ever mentioned being in a dream and controlled by a man was during her evaluation with Dr. Block, which the prosecutor found "convenient." In regard to the manner in which defendant cleaned the condominium, Dr. Block considered it to be "inept cleaning" in which she "apparently clogged toilets[.]" When the prosecutor asked Dr. Block whether it was rational that defendant kept the upstairs toilet clean for her use, Dr. Block stated that she was unaware that there was a running toilet in the condominium. The prosecutor also questioned Dr. Block as to how she chose which statements of defendant's to believe. Specifically, the prosecutor questioned how Dr. Block could believe defendant's statements that she did not recall the details of what occurred, but Dr. Block did not believe defendant's statement that she killed the victim because the victim was in pain. Dr. Block stated that it was her belief that, if defendant truly wanted to put the victim out of pain, she would have chosen some other way than to stab the victim multiple times.

Defendant argues that she presented sufficient evidence to establish that she was legally insane at the time she killed the victim, particularly because Dr. Block was the only expert to testify at trial, and she opined that defendant was legally insane at the time she killed the victim. Despite presenting evidence from an expert witness, "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses." *Lemmon*, 456 Mich at 637. The prosecutor impeached Dr. Block and highlighted the inconsistencies in defendant's memory and focused on the way in which defendant's actions in cleaning the condominium and positioning the victim's body appeared rational and contrived. The evidence indicated that defendant cleaned the

condominium after the victim was killed, which included cleaning the blood off the victim. The evidence also indicated that defendant arranged the victim's body in a manner in which the wounds were not easily noticeable. In addition, defendant admitted that she killed the victim because she was in pain. Defendant also admitted that her actions were inappropriate and she should have just called 911. Further, defendant acknowledged that what she did was wrong and she felt remorse. Thus, the prosecution presented sufficient evidence to support the jury's verdict. Therefore, the verdict must not be vacated.

Defendant also argues the Michigan Supreme Court's holding in *Carpenter*, 464 Mich at 230-231, quoting MCL 768.21a(1), infringed upon her right to present a defense and her due process rights. We disagree.

"A defendant must raise an issue in the trial court to preserve it for our review." *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). In the lower court, defendant did not argue that *Carpenter* infringed on her right to present a defense or her due process rights. Thus, this issue is not preserved for appellate review. However, even though defendant failed to raise the issue below, "this Court may review the issue to the extent that it involves a significant constitutional question." *People v Walker*, 234 Mich App 299, 302; 593 NW2d 673 (1999).

"This Court reviews de novo whether defendant suffered a deprivation of his constitutional right to present a defense." *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). This Court reviews de novo a defendant's constitutional due process claim. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). However, this Court reviews unpreserved claims for plain error. *People v Gibbs*, 299 Mich App 473, 492; 830 NW2d 821 (2013). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

In *Carpenter*, the Michigan Supreme Court concluded that the diminished capacity defense could not be invoked by criminal defendants because it was not intended as part of the Legislature's statutory scheme for mental illness defenses. *Carpenter*, 464 Mich at 236-241. The Supreme Court held the following:

> The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. [*Id*. at 241.]

Defendant's argument is without merit. *Carpenter* is binding precedent on this Court. This Court does not have the authority to overrule or reject our Supreme Court's decision in *Carpenter*. *People v Crockran*, 292 Mich App 253, 256; 808 NW2d 499 (2011) (this Court held that only our Supreme Court has the authority to overrule its own decisions). Therefore, defendant's due

process rights were not violated, and defendant was not denied her right to present a defense when she was unable to put forth the defense of diminished capacity.

Affirmed.

/s/ David H. Sawyer
/s/ Mark T. Boonstra