*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JACQUELYNE FAYE TYSON,

        Defendant-Appellant.

UNPUBLISHED
April 15, 2021

No. 350932
Genesee Circuit Court
LC No. 18-042597-FC

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Jacquelyne Tyson, appeals by right her bench-trial guilty but mentally ill convictions of first-degree premeditated murder, MCL 750.316(1)(a), second-degree murder, MCL 750.317, and two counts of felony-firearm, MCL 750.227b(1). Tyson was sentenced to life in prison without the possibility of parole for the first-degree murder conviction, life in prison for the second-degree murder conviction, and two consecutive years in prison for the felony-firearm convictions. Because there are no errors, we affirm, but remand for the ministerial task of correcting the judgment of sentence.

## I. BASIC FACTS

On July 26, 2016, Tyson walked into the offices of her apartment complex to complain to the assistant manager, Tammy Johnson, about toxins that Tyson believed were contaminating her apartment. After a brief exchange,[1] Tyson pulled a revolver and shot Johnson, who was eight months pregnant, in the head. When describing the shooting, Tyson stated:

---

[1] One witness testified that she heard Johnson "say something to the effect of no one has access to your keys. They are locked up in a box. No one has access to the box." The witness then heard a "pop," realized it was a gunshot, and saw Johnson lying dead behind the desk.

-1-

I told her you have to do something about the toxins. She was on a chair with wheels. She started rolling across the room toward me with hands up on top of each other.

I saw a flash of her dead as she was rolling across the room like a picture. She continued to roll. I saw a flash between her hands and [Johnson] said it's probably just dust and that's when I shot her.

After shooting Johnson, Tyson entered the clubhouse area with her revolver still in her hand. There were three women in the area, including Lyric Work, the apartment complex's leasing consultant. Tyson pointed her gun at Work and shot her in the head. A woman in the same area testified that after she heard the gunshot she started crying. Tyson asked her why she was crying and the woman asked Tyson to not kill her. The woman testified that Tyson said "honey get out of here." The woman fell while trying to leave. She testified that Tyson let her get up and told her "get out of here. I'm not here for you." Another witness recalled hearing Tyson say to the other woman, who was "screaming and hollering and was hysterical," to "shut the fuck up" because "I'm not coming for you" or "I didn't come for you." In contrast, Tyson believed that she said "I didn't come for this." When describing shooting Work, Tyson stated that she had not been "thinking anything or feeling anything," and she "just shot her."

After shooting Work, Tyson left the area and ended up in the pool area of the complex. After standing by the pool for a moment with the gun in her hand, she quickly walked out of the fenced-in pool area and toward the parking lot. By then, a police officer had arrived on the scene. Before the officer got out of his vehicle, Tyson threw her gun into the bushes and laid down.

There was no dispute that Tyson was mentally ill. Her clinical diagnosis after the shooting was schizoaffective disorder with psychotic and mood symptoms. In the months leading up to the shooting, Tyson suffered from various delusions. Her central delusion relates to toxins, which she believed were in the air and were seeping through the vents in her apartment and her vehicle. Another significant delusion related to a "Lieutenant Williams," who was a prior supervisor in a sheriff's department Tyson had worked in. Tyson believed Williams had sexually harassed her and that, even after she left the sheriff's department, he and others were still "out to get her." Tyson's defense was that at the time she shot Johnson and Work she was rendered legally insane by her delusions. As will be discussed in greater detail later in this opinion, she presented expert testimony from Dr. Ann Zaborney, a forensic psychologist at the Center for Forensic Psychiatry. Dr. Zaborney opined that Tyson was mentally ill, and that, as a result of her mental illness, she was legally insane at the time of the shootings. The prosecution presented expert testimony from Dr. Alyssa Benedek, a child, adolescent, and forensic psychiatrist with a private practice. Dr. Benedek opined that, although Tyson was mentally ill, she was not legally insane at the time of the shootings.

The trial court credited Dr. Benedek's testimony and found that at the time of the shootings Tyson's mental illness did not render her legally insane. Thereafter, the court found Tyson guilty but mentally ill of second-degree murder for killing Johnson, and guilty but mentally ill of first-degree murder for killing Work.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Tyson argues that insufficient evidence supported that she was not legally insane at the time of the murder and that insufficient evidence supports her conviction of guilty but mentally ill of first-degree murder. A claim of insufficient evidence is reviewed de novo. *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). We review the sufficiency of the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the elements of the crime were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992). Thus, this Court defers "to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). All conflicts in the evidence must be resolved in favor of the prosecution. *Id.* Sufficient evidence may consist of circumstantial evidence and the reasonable inferences arising therefrom. *Id.*

### B. INSANITY DEFENSE

Tyson first argues that the prosecution presented insufficient evidence to disprove that she was legally insane at the time of the shooting. Relevant to this appeal, under MCL 768.21a(1),

> [i]t is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness . . . that person *lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law*. Mental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity. [Emphasis added.]

The burden rests on the defendant to prove insanity by a preponderance of the evidence. MCL 768.21a(3). Once the "defendant produces sufficient evidence of the elements of the defense, then the question whether the defendant has asserted a valid defense is for the [trier of fact] to decide." *People v Kolanek*, 491 Mich 382, 411-412; 817 NW2d 528 (2012). A reviewing court is "not permitted to interfere with the trier of fact's role in determining the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 620; 751 NW2d 57 (2008). "Moreover, a trier of fact is not bound to accept the opinion of an expert." *Id.* (quotation marks and citation omitted).

Tyson argues that the trial court should have relied on the testimony from her expert, Dr. Zaborney. She describes Dr. Zaborney's report as credible, unimpeached, and based on fact. She contends that Dr. Zaborney "had a great deal more experience" than Dr. Benedek, but in doing so she selectively focuses on the last five years of Dr. Benedek's long career. The testimony at trial, however, shows that Dr. Benedek had been practicing in her field for more than 50 years and was qualified as an expert without objection. She had completed more than 500 evaluations for various courts during her time at the Center for Forensic Psychiatry, and she had trained 150 to 200 other personnel. Her credentials and expertise were not in doubt. Thus, although Tyson points to testimony that Dr. Benedek may have only performed 10 criminal responsibility evaluations within the past five years, her argument ignores Dr. Benedek's extensive experience and knowledge

acquired in more than 50 years of practice. Regardless, the mere fact that Dr. Zaborney performed more criminal responsibility evaluations does not mean that her opinion testimony is superior. Rather, that is just one aspect of credibility that can be considered by the trier of fact when reaching a decision.

Next, Tyson's attempts to show that Dr. Benedek was somehow biased are disingenuous. Dr. Benedek testified that she had done evaluations for *both* the prosecution and defense, that a critical part of her process was to remain independent and objective, and that her "opinion would be [her] opinion and it would fall either way."

Continuing her attack on Dr. Benedek's credibility, Tyson next proclaims that Dr. Benedek's effort to undermine Dr. Zaborney's credibility "backfired spectacularly." In doing so she directs this Court to testimony by Dr. Benedek that she believed the Center for Forensic Psychiatry was finding an increasing number of persons legally insane. Dr. Zaborney testified in response that when the statistics were examined there was no factual basis to support Dr. Benedek's belief. On appeal, Tyson equates Dr. Benedek's mistaken belief as a "false factual claim" meant to discredit the defense. She asserts that as a result of that testimony, Dr. Benedek's testimony was "destroyed." Our review of the evidence, however, does not show any indication that Dr. Benedek deliberately and maliciously made a false factual claim to discredit the defense. The mere fact that she was mistaken does not destroy her credibility.

Tyson further argues that Dr. Benedek was not credible by claiming that she employed a flawed definition of legal insanity when she allegedly said insanity was "random behavior" with no "thought behind her actions." First, however, Dr. Benedek did, in fact, rely on the proper definition of legal insanity. She testified that in order to be legally insane, "you cannot appreciate wrongfulness or not be able to conform." Further, in her report, she addressed each basis for legal insanity separately, correctly noting that in order to be insane, a defendant need only meet one prong of the definition. Again, legal insanity can be proved by showing that a defendant "lacks substantial capacity either to appreciate the nature and quality of the wrongfulness of his or her conduct *or* to conform his or her conduct to the requirements of the law." MCL 768.21a(1) (emphasis added). Although she did not use the exact language in the statute, her testimony makes it clear that she was examining whether Tyson appreciated the wrongfulness of her conduct and whether she was able to conform to the requirements of the law.

Second, the artfully selected quotations that Tyson relies on from Dr. Benedek's testimony are taken out of context. Dr. Benedek was asked why she emphasized that Tyson threw a gun into the bushes and Tyson's statement to a witness that she was "not here for you." Dr. Benedek answered:

> Well, I think all of those things are important because Ms. Tyson doesn't tell you what she is thinking or feeling or what's going on in her head when all of these events are occurring, what you have to do is try and understand her behavior, and she has a gun, and she gets rid of the gun after the crime. She throws it in the bushes right away. She knows. That gives you some information *that she appreciates that she's done something wrong.* She disposes of the weapon. And then she tells the officers where the weapon is. And the witness's statement, and I think two of the

witnesses made this statement, that they heard Ms. Tyson say, and, in fact, she said to one of them, I'm not here for you.

So, her actions in shooting the two women in the rental office were deliberate. She was there for them. She was not here for the bystanders. She went into a rental office with a gun and killed two women there and spared other women who were witnesses.

So, although she was seriously ill, there was some deliberation in her behavior, and it's not the kind of random behavior that you might see or might often see, and there was thought behind her actions. [Emphasis added.]

Subsequently, Dr. Benedek testified that it was significant that Tyson fled after shooting two people because it shows that "she does appreciate she did something wrong." She opined that the fact that she spared the other two women in the complex even though she had extra bullets in her gun showed that she could "conform her behavior if she chose to do so," and also noted that she "was specific in who she picked out to shoot." Further, the fact that Tyson laid on the ground before the officer said anything was another "indication that she appreciated what she did was wrong and illegal." Viewing Dr. Benedek's testimony as a whole, it is evident that she did not employ the wrong legal standard when evaluating Tyson. Rather, her testimony reflects that she used the legal insanity definition in MCL 768.21a(1) when evaluating Tyson.

Next, Tyson argues that Dr. Benedek's testimony was unworthy of belief because, notwithstanding Tyson's denial of having a mental illness, Dr. Benedek opined that Tyson was a "manipulative historian" who described her own behavior "in the best light possible for her." Tyson then points to aspects of Dr. Zaborney's testimony relying on similar statements by Tyson to show that Tyson was disassociated from reality. After summing up each expert's respective testimony, Tyson asserts that Dr. Zaborney's "explanation was more credible than Dr. Benedek's implication of deceit." Again, however, credibility is the province of the trier of fact. Here, the trial court credited Dr. Benedek's testimony, and we will not disturb that finding by making a contrary credibility determination. *Kanaan*, 278 Mich App at 620.

Tyson contends that it is not credible to believe that her delusional system vanished and that she became rational and no longer driven by her delusions the moment she entered the office. Tyson's argument misapprehends the evidence supporting the court's finding that she was not legally insane. Although there was no evidence presented supporting an inference that Tyson's delusional system vanished when she entered the office, Dr. Benedek's opinion was that, notwithstanding Tyson's mental illness (which manifested in delusions), Tyson could still appreciate the wrongfulness of her conduct and could still conform her conduct to what was required under the law. This claim of error, therefore, lacks merit.

Tyson also argues that the shooting itself was evidence that she was legally insane because her behavior exhibited "extreme brutality of which most people with a form of conscience or restraint are incapable of." We disagree. Many crimes committed by individuals who are legally sane exhibit extreme brutality and that fact alone is not proof of legal insanity. Further, Tyson's reliance on our Supreme Court's decision in *People v Murphy*, 416 Mich 453; 331 NW2d 152 (1982) is misplaced. In that case, both the prosecution and the defense expert opined that the

defendant was legally insane at the time he committed the charged crime, and our Supreme Court concluded that there was insufficient evidence to show that the defendant was sane at the time he committed the offense. *Id*. at 464-465, 467. In doing so, the Court noted the defense expert's opinion that the defendant was legally insane based on a number of reasons, including that "[t]he nature of the crime indicated an extreme brutality and sadism of which most people with any form of conscience or restraint are incapable." *Id*. at 461. Here, unlike the experts in *Murphy*, Dr. Benedek and Dr. Zaborney did not agree on the issue of Tyson's sanity, nor did Dr. Zaborney offer the "extreme brutality" of the crime as support for her determination that Tyson was legally insane. Moreover, even if an inference of insanity could be drawn from the so-called "extreme brutality" of the crime, the trier of fact was not required to credit that inference. In this case, no such inference was drawn.

Tyson stresses that there was independent evidence to corroborate that she was operating under a paranoid delusion that toxins were in the air and were seeping into her apartment. She also notes that there was an "utter absence of motive for the shootings beyond the delusions," and recounts witness testimony describing her as calm and emotionless after the shooting. We agree that the evidence does support that Tyson was suffering from delusions and that she appeared calm and emotionless after the shooting. Further, Dr. Zaborney did opine that Tyson was disassociated from reality during and after the shooting. Yet, just because that evidence *could* support a finding that she was legally insane does not mean that the trier of fact was required to draw that conclusion. Instead, the court found credible the testimony from Dr. Benedek. There is no error in that determination.

Finally, Tyson argues that by looking at Tyson's actions and thoughts before and after the shootings, the trial court applied the wrong legal standard. Again, the relevant inquiry is whether at the time she committed the crimes, Tyson was legally insane. MCL 768.21a(1). Yet, nothing in the statute precludes consideration of the events preceding or following the crime. Indeed, both the prosecution and the defense experts found support for their respective opinions regarding whether or not Tyson was legally insane at the time of the offense. Here, in stating its findings, the trial court explicitly stated that insanity was defined by statute and that insanity was measured at the time of the shooting. And, although it considered Tyson's conduct before and after the shooting, it did so only as a means to determine whether she was legally insane at the time of the shootings.

## C. FIRST-DEGREE MURDER

Tyson next argues that there was insufficient evidence to support the trial court's finding that she premediated and deliberated in the murder of Work. A defendant is guilty of first-degree murder when she or he commits "[m]urder perpetrated by . . . willful, deliberate, and premeditated killing." MCL 750.316(1)(a). The essential elements to prove first-degree murder are: "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). "First-degree premeditated murder is only distinguished from second-degree murder by the element of premeditation." *People v Walker*, 330 Mich App 378, 383; 948 NW2d 122 (2019).

Premeditation is not statutorily defined, but our Supreme Court has stated that "[t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Oros*, 502 Mich at 240 (quotation marks and citation omitted). Although "premeditation and deliberation are separate elements, a rigid and mechanical application is often difficult because the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant." *Id*. at 240-241. " 'The real focus of first-degree murder jurisprudence in Michigan has been on the kind of evidence which permits an inference of premeditation and deliberation,' and that inference may be established 'from *all* the facts of the case.' " *Id*. at 243 (citation omitted). We recently discussed in detail the aspects surrounding premeditation:

> Premeditation cannot be found where a defendant acts "on a sudden impulse." The brutality and violence of a killing does not, by itself, show premeditation. However, premeditation may be established by circumstantial evidence tending to show that a defendant had an opportunity to think about, evaluate, or take a "second look" at their actions. The opportunity must be adequate, but it need not be long. [*Walker*, 330 Mich App at 383-384 (citations omitted).]

"Premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Id*. at 384 (quotation marks and citation omitted).

One of the witnesses in the clubhouse during the shooting heard the first gunshot and then saw Tyson walk up to Work and shoot her in the head. An investigating police officer testified that it took approximately six seconds to get from Johnson's location to Work's location. There is no time limit for premeditation and deliberation; it merely requires a person to think beforehand and to evaluate the consequences of a particular choice. *Oros*, 502 Mich at 240. Thus, there was evidence showing that Tyson had at least six seconds to make a conscious decision to walk to Work, point the gun at her head, and shoot her point blank. Such conduct was evidence against a "sudden impulse" negating premeditation and, instead, could be seen as evidence that Tyson had the opportunity for a "second look" at her actions. *Walker*, 330 Mich App at 383-384 (quotation marks omitted). The trial court found this to be so, and we discern no error.

Furthermore, Tyson was described as being calm, which could be construed as evidence of premeditation and deliberation. Tyson also stated something to the effect of "I'm not here for you" to one of the witnesses in the clubhouse, and Dr. Benedek believed this indicated that Tyson targeted Johnson and Work deliberately and was not there to kill other people. Similarly, Tyson's actions of tossing the weapon into the bushes could be construed as evidence of trying to cover up her involvement. Such evidence supported the factors of "the circumstances of the killing itself; and . . . the defendant's conduct after the homicide." *Walker*, 330 Mich App at 384 (quotation marks and citation omitted). Therefore, viewing the evidence in support of the trier of fact's decision, there was evidence to support the trial court's finding that Tyson premeditated and deliberated in shooting Work.

-7-

## D. GREAT WEIGHT OF THE EVIDENCE

Tyson contends that the trial court's verdict of guilty but mentally ill was against the great weight of the evidence. "In a case tried without a jury, the appellant need not file a motion for remand or a motion for new trial to challenge the great weight of the evidence in order to preserve the issue for appeal." MCR 7.211(C)(1)(c). "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Lopez*, 305 Mich App 686, 696; 854 NW2d 205 (2014) (quotation marks and citation omitted).

Relying on all the above arguments, Tyson contends that the verdict was against the great weight of the evidence. Having considered the whole record, we disagree. In reviewing the weight of the evidence supporting a conviction, we may not invade the fact-finder's role to assess the credibility of the witnesses. *People v Savage*, 327 Mich App 604, 614-615; 935 NW2d 69 (2019). We may intervene only in "exceptional circumstances," such as where the "testimony contradicts indisputable facts or laws," "is patently incredible or defies physical realities," is "so inherently implausible that it could not be believed by a reasonable juror," or "has been seriously impeached and the case is marked by uncertainties and discrepancies." *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998) (quotation marks and citations omitted).

Here, the main thrust of Tyson's argument is that Dr. Benedek's testimony was substantially less credible than Dr. Zaborney's testimony. Yet, having reviewed both, we discern no serious impeachment of Dr. Benedek's credibility. Instead, Tyson challenges her partiality, her credentials, and her opinions when contrasted with Dr. Zaborney's opinions. She also insinuates that Dr. Benedek resulted to false statements to discredit the defense, but, as explained above, Dr. Benedek's testimony about an increase in findings of legal insanity was based on her belief, which has not been shown to be deliberately and maliciously false. Further, her argument that Dr. Benedek applied the wrong legal standard is wholly disproven based on the entirety of Dr. Benedek's testimony, which repeatedly affirms that she applied the correct standard. Viewing all the evidence, it is clear that there was substantial evidence supporting a finding that Tyson was legally insane at the time of the shootings; however, there was also substantial evidence that Tyson was not legally insane. The trial court credited the prosecution's expert, and that finding was not against the great weight of the evidence.

Similarly, while she directs this Court to evidence suggesting that premeditation and deliberation did not exist, our review of the whole record does not support a finding that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.[2]

---

[2] Tyson also suggests that a salient consideration that weighs against a finding of first-degree murder is that Tyson was suffering from a severe mental illness at the time of the murder and that it took nearly two years before she was determined competent to stand trial. The fact that a defendant is mentally ill does not excuse criminal responsibility in the absence of legal insanity at the time of the offense. Likewise, the time it takes between a crime and when a defendant is found

## III. DIMINISHED CAPACITY

Tyson next argues for the first time on appeal that the decision in *People v Carpenter*, 464 Mich 223, 225-226; 627 NW2d 276 (2001), recognizing that the Legislature abolished the defense of diminished capacity, was wrongly decided. However, we are bound to follow the decisions of our Supreme Court unless they have been overruled or superseded, *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017). Consequently, even if we were to conclude that *Carpenter* was wrongly decided, we are required to apply it.

## IV. SENTENCE

Finally, Tyson argues that her judgment of sentence contains a clerical error. The judgment of sentence states that Count 3 is a sentence of life without parole, but does not indicate that Count 1 is a sentence of life with the possibility of parole. Tyson requests that this Court remand for the ministerial task of correcting the judgment of sentence so that it properly reflects that her second-degree murder conviction of life with the possibility of parole. The prosecution does not oppose remand for correction of the judgment of sentence. Because her sentence for second-degree murder is life with the possibility of parole and because her judgment of sentence does not reflect that fact, we remand to the trial court for the ministerial task of correcting the judgment of sentence.

Affirmed, but remanded for the ministerial task of correcting the judgment of sentence. We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly

---

competent to stand trial does not mean that the evidence adduced at the trial preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.